**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JARED H.,[1]                           )
                                        )
             **Plaintiff,**        )        **No. 21 C 4587**
                                        )
v.                                      )        **Magistrate Judge Jeffrey Cole**
                                        )
KILOLO KIJAKAZI,                        )
**Acting Commissioner of Social Security,**   )
                                        )
             **Defendant.**        )


**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§416(I), 423, 1381a, 1382c just over two years ago in February and December of 2020. (Administrative Record (R.) 209-16). He claimed that he has been disabled since May of 2016 (R. 242, 246) due to "shattered . . . whole foot . . . put a metal plate, screws, . . . removed bone fragments, put in cadaver bone, put metal back." (R. 246). Over the next year, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the final ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on August 27, 2021, and the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on November 9, 2021. [Dkt. #10]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

**I.**

**A.**

Plaintiff was born on April 22, 1983, making him just 33 years old when he claims he became unable to work. (R.209). With the exception of a year and a half, he worked steadily from 1998 through 2016. (R. 232-33). For most of that time, he was a dock worker and a forklift operator. (R. 235, 247). But sometime in 2016, he tried to jump over a railing on his porch and fell, injuring his left foot. (R. 40-42). Since then, he's had a couple more surgeries and at the time of his hearing in March 2021, he was using a knee scooter. (R. 42).

That jump off the porch left plaintiff with a displaced navicular fracture in his left foot. (R. 801). On October 3, 2016, plaintiff reported pain at 6/10 and had bruising. Review of systems and physical exam were completely normal aside from that. (R. 425-26). An open reduction and internal fixation (ORIF) surgery was recommended (R. 426), and performed the next day. (R. 428). A week later, plaintiff reported he was doing well with his progress. He said his pain was 7/10, but tolerable. (R. 428). He was in a boot, but on non-weight-baring status. (R. 428).

On November 17, 2016, plaintiff reported "doing fine." Imaging showed good position and alignment of the surgical hardware. He was neurovascularly intact with no focal deficits. The doctor felt he could begin weight-bearing as tolerated with the walking boot and begin physical therapy. (R. 793). During the initial physical therapy evaluation on November 29, 2016, plaintiff reported having only 2/10 pain, and 5/10 at its worst (R. 798). There was tenderness to palpation and the ankle/foot were warm to the touch. Range of motion and strength were somewhat decrease. (R. 789).

On December 8, 2016, plaintiff reported he was "doing well," had "decreased" pain, was

2

walking with the boot without any complication, and was "very happy with his progress thus far" (R. 776). Imaging showed good alignment and near-complete fracture healing. He was to wean himself out of the boot. (R. 776). On January 5, 2017, he was ambulating in a "regular shoe" without discomfort and "doing okay," though he reported not going to physical therapy recently and said he had had some episodes of extreme pain across the front of his foot. (R. 772) Exam revealed tenderness to palpation where the medial screw had been placed. There was a little bit of swelling. X-rays continued to show good positioning. (R. 774).

On March 1, 2017, he reported his left foot pain had improved. (R. 768). Upon examination, gait was normal. There was no tenderness, swelling, or sensation or strength deficits. (R. 769). On March 16, 2017, a CT scan of his left foot revealed a comminuted fracture of the navicular bone status post open reduction and internal fixation as well as an abutting and indenting screw, but intact hardware and most of the fracture fragments appeared to be in near anatomic alignment. (R. 740). Plaintiff tested positive for benzos, cocaine, and marijuana. (R. 741). He was drinking daily as well, and his liver enzymes were elevated. (R. 761, 763).

On April 3, 2017, after plaintiff reported "doing pretty well" and "feeling pretty well," the plan was to remove the hardware. (R. 758). Examination was normal aside from some tenderness around the hardware, and x-rays showed good position and alignment. (R. 759). The hardware was removed, he was put in a boot, and was doing very well as of April 27, 2017, (R. 757). By May 18, 2017, plaintiff said he noticed a huge improvement. Doctors felt he could return to normal activity and footware as tolerated. (R. 754). He continued to improve and increased activity through June, although he was unable to do heavy lifting. Physical therapy was recommended. (R. 753). He reported drinking a pint of vodka and a beer every day. (R. 749). He was diagnosed with

3

uncomplicated alcohol dependence and advised to get counseling.

In September 2017, he reported having uncontrolled pain, but an exam revealed no distress and no deficits in his extremities (R. 742). He was referred to a pain management specialist. On October 4, 2017, liver enzymes were still elevated and plaintiff was advised to diet, exercise, lose weight, and cut down on his alcohol use. (R. 744). At plaintiff's first pain clinic visit on November 1, 2017, he reported a number of new problems: severe pain that radiated, problems standing more than 90 minutes, some numbness, swelling, and problems doing the exercises in physical therapy. (R. 738). There were no problems with his gait. (R. 738, 740). He reported using marijuana. (R. 738). An exam revealed mild swelling, some warmth, and some mild tenderness, but no erythema, normal color, no unusual hyportrophic changes, a well-healed surgical scar, and an active range of motion that was neutral with dorsiflexion and an extra 10 degrees of range with passive stretching. The doctor advised plaintiff he "may be left with pain in the area for at least several more months, possibly for years and possibly permanently." He was given anti-inflammatories, over-the-counter Tylenol, and diclofenac. (R. 738-40).

In January 2018, an ultrasound of his liver showed fatty liver disease: increased echogenicity of liver parenchyma most consistent with hepatic steatosis. He was again advised to avoid alcohol. (R. 847).

At a June 2018 pain clinic followup, plaintiff reported he had been doing well, but developed a popping sensation in his foot. He also reported that he had felt increased pain after he jumped into a pool over the weekend, rating it at 7/10. (R. 734). Physical examination revealed moderate tenderness over the navicular, but was otherwise completely normal with no neurovascular deficits, 5/5 strength, a full range of motion, and a normal gait. (R. 736). The doctor recommended removing

4

the fragment off the navicular bone. (R. 736).

After that procedure, by August 2, 2018, plaintiff was able to wear a walking boot. There was only a mild amount of swelling and range of motion was appropriate. (R. 729). Plaintiff continued to do well through August. (R. 725-27). He reported mild pain on September 20, 2018, and there was mild swelling, but range of motion was again appropriate. (R. 724). He began a course of physical therapy in October 2018. (R. 712). At the initial session, plaintiff reported having 8/10 pain in his left foot in the morning, 5/10 when standing, 3/10 when walking around his house, 6/10 when walking outside, 5/10 when ascending stairs, and 4/10 when descending. (R. 717-20). He said he wore a boot and used crutches, but was wearing shoes at the session. (R. 713). On October 15, 2018, plaintiff reported his ankle was stiff in the morning but denied any pain. (R. 702). On a visit to his surgeon at that time he reported he was progressing well and pain was 3/10. (R. 694). Exam was normal aside from some swelling; range of motion was good, joint strength was 5/5, there was no tenderness, and neurological signs were normal. (R. 696). On November 15, 2018, plaintiff reported that his ankle was tight, pain was 3/10 with movement, and was not too bad. (R.690).

On February 2019, plaintiff returned to the pain clinic complaining of left foot pain at 7/10 and problems standing/walking for extended periods (R. 678). An exam revealed tenderness but was otherwise normal: gait was normal, reflexes and strength were normal, and range of motion was full. (R. 681). Plaintiff had a left foot medial column fusion in March 2019. On April 11, 2019, although plaintiff reported moderate pain controlled by Norco, exam revealed mild swelling, appropriate range of motion, acute distress, a full range of motion in his extremities, and no swelling. He was doing well post-operatively and was place in a cast and would be non-weight-bearing for two weeks.

(R. 677). On May 16, 2019, he was "doing very well" and imaging showed good position and alignment. (R. 672). He was to discontinue wearing the boot, start weight-bearing, and participate in physical therapy. (R. 672).

On June 27, 2019, plaintiff reported pain was present but manageable. Physical exam was normal aside from minor swelling. The doctor said the plaintiff could be weight-bearing with the boot. (R. 668). On July 25, 2019, although he felt pain and discomfort, particularly when bearing any weight, plaintiff was "doing well" and walking in a "regular shoe" (R. 663). Gait was normal, range of motion was normal, Strength and reflexes were normal. (R. 666). Plaintiff admitted he was still drinking one pint of vodka and one beer every day, smoking marijuana every day, and using cocaine. (R. 664). The doctor told plaintiff to continue working on weight-bearing. (R. 666). As of August 22, 2019, plaintiff was doing well although he still had pain and discomfort; pain was 4/10. (R. 660). Exam was agin normal including gait. (R. 660-61). Reviewing x-rays, the doctor questioned whether solid bone had yet to form from the cuneifrom to the bone wedge. (R. 661).

On October 3, 2019, the doctor noted that although plaintiff's left foot was not completely healed and he still had pain, he was "for the most part better," walking in a shoe, and "doing well." (R. 656). Exam was again normal including gait. (R. 657). There was limited motion about the ankle. (R. 657). The doctor gave plaintiff some more pain medication, but would discontinue it after that, and refer plaintiff to pain management. (R. 656). On November 7, 2019, plaintiff claimed to have left foot pain and decreased sensation and was using a cane. (R. 350-51). He was still drinking – on the weekends – and using cannabis/THC daily. (R. 351, 352). Moderate THC dependence was noted. (R. 652). But, he had normal range of motion, was walking "normally," and was out of the boot for the last 30 days. (R. 350-52). There were some sensory changes and slight

6

swelling and tenderness. (R. 652, 653). He was prescribed pain medication and advised to stop using THC. (R. 653).

On January 6, 2020, plaintiff complained of left foot stiffness, pain, and numbness. He was still drinking daily. (R. 646). But, examination of the foot was normal, with the exception of increased sensitivity: no swelling, normal range of motion, motor strength normal, not foot drop. (R. 648). Due to noncompliance, he was discontinued as a patient in stable condition and submitted to "dmg." (R. 648-49).

On January 8, 2020, plaintiff had a psychological consultative examination by John Brauer, Psy.D., in connection with his application for benefits. (R. 557-560). Plaintiff reported that after multiple surgeries, his foot has not healed properly, resulting in pain ranging from 3/10 to 7/10 and general at 4 or 5/10. (R. 557). Plaintiff said he suffered from anxiety for years, but takes no medication and has sought no counseling or other treatment. (R. 557-58) He explained that he lived with his father and brother, and his children live elsewhere with their mother. (R. 557). Dr. Brauer noted that plaintiff's affect was grossly appropriate, and speech was logical. (R. 558). Concentration and attention appeared normal based on digit recall, serial sevens, and calculations. Fund of knowledge was also grossly intact. (R. 559). Plaintiff's capacity for abstraction was reasonably well developed, and his capacity for classification and organization was adequate. (R. 559). Dr. Brauer noted that plaintiff demonstrated symptoms consistent with a long history of anxiety, exacerbated by pain and injury. He noted that Plaintiff avoids crowded settings for fear of panic attacks, and also has a depressed mood related to the loss of work and activity resulting from his injury. Diagnoses were panic disorder, agoraphobia, and adjustment disorder with depressed mood. (R. 559-560).

7

On March 9, 2020, plaintiff went to his new doctor and reported his left foot pain typically at 5/10. (R. 632). Exam was normal aside from tenderness to palpation in the left foot. Imaging revealed a broken and incomplete healing. He was referred for an Arizona brace. (R. 634-35). On June 30, 2020, plaintiff reported pain over the previous week. (R. 626). There was again tenderness to palpation, but exam was normal otherwise. (R. 629). Plaintiff had not followed through on getting the ankle brace. (R. 629).

Plaintiff's treating physician filled out a Musculoskeletal Deficits Report from plaintiff's attorney on June 30, 2020. He noted that had a history of a navicular fracture with subsequent surgeries, the latest being a mid-foot fusion. The doctor indicated plaintiff's navicular fracture was healed, his mid-foot fusion was not fully healed, but was weight-bearing. (R. 561). He indicated that plaintiff reported pain. Plaintiff's only limitation of motion was in the mid-foot due to fusion surgery. (R. 526). The doctor noted plaintiff used a cane, although it was not prescribed. (R. 562). The doctor felt plaintiff could "work sedentary occupation, full time. (R. 563).

Plaintiff was finally fitted for an AFO brace for his ankle in July 2020 and received it on August 7, 2020. (R. 642-45). At the fitting, he was able to ambulate down the hall without complication. (R. 645).

In September 2020, Plaintiff said he was having increased pain since hearing a popping noise while walking two months earlier. (R. 825). Exam revealed swelling and tenderness but no other issues. (R. 826). On October 6, 2020, plaintiff arrived using a cane; said he had been for nine months. He complained of foot pain after a "pop" a month earlier getting up from a chair. Illicit drug use was noted. (R. 821). Gait was antalgic, and there was moderate pain and swelling in the left ankle. (R. 822-23). On October 19, 2020, a CT scan of his left ankle revealed chronic

fragmentation and displacement of the native navicular with postsurgical changes of arthrodesis noted at the midfoot as well as a broken fusion staple, but no evidence of solid osseous fusion between the talar head and a bone graft fragment located at the anatomic site of the navicular and no evidence of solid osseous fusion between the bone graft fragment and the medial/intermediate cuneiforms. (R. 1001). In December 2020, he was using a cane due to balance issues and reported having left foot pain. During an exam, although he had an antalgic gait, moderate pain, and edema, he had intact sensation, no skin deficits, and full strength. He was advised to quit smoking, and surgery was recommended. (R. 810-12).

In January 2021, after having a history of "heavy alcohol use" and having labs that showed worsening liver enzymes and hyperkalemia, he was diagnosed with alcoholic liver disease. (R. 985). He was to participate in counseling, referred to alcoholics anonymous, and to have further testing. (R. 987). A week later, plaintiff underwent surgical repair of the nonunion tarsal bones, talonavicular arthrodesis with calcaneal autograft, navicular cuneiform joint arthrodesis with calcaneal autograft, and removal of hardware in his left foot (R. 1008).

On February 2, 2021, plaintiff went in for followup using a knee scooter. He requested a change in pain medication, but reported his pain was "controlled." (R. 980). An exam revealed edema and some mild blistering but intact sensation, intact staples with no drainage, and good alignment. Staples were removed and he was placed in a splint. Plaintiff was to remain non-weight-bearing with a knee scooter, as well as ice and elevate. (R. 977).

**B.**

After an administrative hearing at which plaintiff– represented by counsel – and a vocational expert testified, the ALJ determined the plaintiff had the following severe impairments: arthritis

status post closed displaced fracture of navicular bone of left foot; left foot neuropathy; alcohol dependence; and alcoholic liver disease. (R. 19). The ALJ found plaintiff's mental impairments of panic disorder, agoraphobia, adjustment disorder with depressed mood and mixed anxiety, and generalized anxiety disorder, considered singly and in combination, do not cause more than minimal limitation in plaintiff's ability to perform basic mental work activities and were, therefore, nonsevere. (R. 19-21). The ALJ then concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings for musculoskeletal disorders (1.02, 1.03, 1.06) and liver disease (5.05). (R. 22-23).

The ALJ then determined that plaintiff could perform sedentary work with the following additional limitations:

> occasionally using the left foot for foot controls; occasionally pushing/pulling with the left lower extremity; occasionally climbing ramps or stairs but never climbing ladders, ropes, or scaffolds; occasionally kneeling, crouching, crawling, or balancing; avoiding exposure to extreme heat or cold; avoiding dangerous machinery and unprotected heights; occasionally operating a commercial motor vehicle; standing or walking no more than one hour and sitting for seven hours per workday; and using a handheld assistive device during the one hour of standing or walking.

(R. 23). The ALJ then summarized the plaintiff's allegations:

> He elevates his foot many times per day. He has to use crutches so much to get around that his arms hurt. He has been using a cane for about 2 and ½ years for stability. He can walk about one block before he feels really severe pain. He has trouble with using stairs. He cannot carry groceries. To help with the pain, he elevates and uses ice. He has cut back on his smoking. He uses Oxycodone, but he has taken other medications throughout the years, including Vicodin. He smokes marijuana to help with his neuropathy. Without marijuana and his pain medication, his symptoms would be unbearable. Tramadol made him nauseous. He does not drive because of the poor circulation in his leg. To climb stairs in his house, he scoots on his butt and takes rests. He has difficulty showering and he has fallen in the shower due to balance issues. He can only do limited household chores and cook. During a

10

typical day, he reads, watches TV, and feels fatigued. He has worn a boot at times. He used cocaine in his 20s.

(R. 24).

The ALJ then determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [the ALJ said] the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 24). The ALJ then reviewed the medical evidence and stated that it shows that the plaintiff's physical impairments result in some degree of functional limitation, but not to the extent alleged. (R. 24-28). The ALJ acknowledged that the plaintiff had pain in his left foot and had to have more than one surgery, but noted that there were many exam results showing normal results, including normal gait, and plaintiff's pain was controlled and he was doing well. (R. 28). The ALJ added that plaintiff did not follow through with medical advice. (R. 28). The ALJ explained that the limitation to sedentary work with additional postural restrictions, including the use of a cane when needed, accommodated plaintiff's foot pain. (R. 29).

As for medical opinions, the ALJ noted the state agency reviewing physicians found that plaintiff could essentially perform light work, although limited to walking and standing two hours a day. However, the ALJ found them unpersuasive, because the evidence supported more significant physical limitations to sedentary work. (R. 29). The ALJ found the opinion from plaintiff's treating physician, Dr. Tolan, that plaintiff was limited to sedentary work persuasive, as it was consistent with the medical record and plaintiff's reports of foot pain. (R. 29). The ALJ found the opinion from another of plaintiff's treating doctors, Dr. Vajaria, that plaintiff should be non-weight-bearing

with a knee scooter unpersuasive and temporary in nature, as it was issued shortly after surgery, and the doctor noted plaintiff's improvement thereafter. (R. 29).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could no longer perform his past heavy and medium work, but could perform sedentary jobs that existed in significant numbers in the national economy, such as: document preparer (DOT 249.587-018; 18,900 jobs); sorter (DOT #521.687-086; 2,180 jobs); and touch-up screener (DOT#726.684-110; 1,034 jobs). (R. 30-31). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 31).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an

"accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build a "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might

13

see a trickle of a creek the court can hop across on a rock or two.[2]  In any event, the Seventh Circuit has also called this requirement "lax."  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).  All ALJs really need to do is "minimally articulate" their reasoning.  *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016).  "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough."  *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3]  The ALJ has done enough

---

[2] By way of example, in the Seventh Circuit's recent ruling in *Jarnutowski v. Kijakazi*, No. 21-2130, 2022 WL 4126293 (7th Cir. Sept. 12, 2022), two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

[3] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it

(continued...)

here.

## III.

The plaintiff makes two arguments for remanding the ALJ's decision. First, the plaintiff contends that record does not support the ALJ's finding that plaintiff would be capable of sitting for seven hours a day and standing/walking for an hour while remaining on task. And, second, the plaintiff argues that the ALJ wrongfully dismissed his mental impairments as non-severe, and then the ALJ failed to address non-exertional limitations arising out of plaintiff's combined physical and mental impairments. Any other arguments plaintiff might have raised are, of course, deemed waived. *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

## A.

There is no dispute plaintiff has pain in his foot. Ever since his jump off his porch there have been issues with healing the resultant damage. As the medical record shows, plaintiff has had multiple surgeries: open reduction and internal fixation in October 2016, removal of bone fragments in July 2018, medial column fusion in March 2019, and mid-foot fusion and removal of a broken staple in January 2021. Obviously, after each, there is a recovery period. But, as the ALJ noted, and as the summary of the medical record demonstrates, for the most part, plaintiff did well following surgeries and had essentially normal exams in terms of strength, reflexes, range of motion, and gait.

---

[3](...continued)
irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). More recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

That's not to say that issues did not eventually crop up – again, obviously, as further surgery was required. But, based on the medical evidence, they were short-lived. Barely a month after plaintiff's first surgery in October of 2016, he was doing fine and ready to begin weight-bearing as tolerated with the walking boot and begin physical therapy. (R. 793). A couple of weeks after that, his range of motion was still somewhat decreased and there was still tenderness; but pain was generally only 2/10, 5/10 at the worst. (R. 798). A week later, he was walking with the boot without complications and was happy with his progress. (R. 776). A month after that, in January of 2017, he was walking in a regular shoe without discomfort. (R. 772). There were still episodes of severe pain and some swelling, but by March 2017 plaintiff's gait was normal, and there was no tenderness, swelling, or decrease in sensation or strength. (R. 769).

The hardware in plaintiff's foot was then removed in April 2017. By May 18, 2017, improvement was significant, and doctors said plaintiff should return to normal activity and as tolerated. (R. 754). He continued along until he reported uncontrolled pain in September of 2017. But, again, examination was normal. (R. 742). In November 2017, plaintiff reported problems standing more than 90 minutes, some numbness, swelling, and problems doing the exercises in physical therapy, although there were no issues with his gait. (R. 738, 740). At that point, the doctor at the pain clinic explained that plaintiff's pain might never go away for good. (R. 738-40).

Plaintiff seemed to continue along fine after that until he seemed to think he reinjured himself jumping into a pool in June 2018. But, examination was, once again, essentially normal including strength, range of motion, and gait. (R. 736). At that point, bone fragments were surgically removed, and recovery went as expected with appropriate findings through October 2018.

16

(R. 724, 725-27, 729). In October 2018, there was some swelling; but range of motion was good, joint strength was 5/5, there was no tenderness, and neurological signs were normal. (R. 696). While plaintiff complain of pain at 7/10 when standing/walking for extended periods in February 2019, exam revealed tenderness but gait was normal, reflexes and strength were normal, and range of motion was full. (R. 681).

Plaintiff had the left foot medial column fusion in March 2019. He experienced pain thereafter, but it was relieved with Norco and an April 11, 2019 exam revealed mild swelling, appropriate range of motion, no acute distress, a full range of motion in his extremities, and no swelling. He was in a cast and non-weight-bearing for two weeks. (R. 677). In May 2019, it was time to discontinue the walking boot and return to physical therapy. (R. 672). Through the summer of 2019, plaintiff experienced pain and discomfort walking, but gait was normal, range of motion was normal, and strength and reflexes were normal. (R. 660-61, 666). Through November 2019, gait was normal, plaintiff was doing well, and he was walking normally without a boot, although he showed up at a session with a cane. (R. 350-52, 657). At a January 2020 examination his foot was normal, with the exception of increased sensitivity: no swelling, normal range of motion, normal motor strength, no foot drop. When his treating physician dismissed the plaintiff due to his marijuana use and non-compliance, the doctor said he was in stable condition. (R. 648-49).

Plaintiff's new doctor felt healing was incomplete and noted tenderness in the area, but also essentially normal findings other than that. (R. 629). When plaintiff was fitted for his ankle brace in August 2020, it was noted he walked in it without complication. (R. 645). In October 2020, plaintiff was using a cane – and still using illicit drugs – and it was noted that his gait was antalgic and that there was tenderness in the left ankle. (R. 821-23). He was still using a cane in December

2020, Exam at that time revealed antalgic gait and swelling, but also intact sensation and full strength. Review of a CT scan at that time indicated another surgery was needed. (R. 1001, 1008). Plaintiff had this last procedure in January 2021, and in February 2021 examination showed good surgical alignment. Plaintiff's pain was controlled and he was to remain non-weight-bearing using a knee scooter, apply ice, and elevate his foot during recovery. (R. 977, 980). That's about where the medical record ends. Plaintiff speculates that "the sheer number of surgeries undergone by Plaintiff for his left foot suggests that this will be an ongoing (indeed worsening) problem." [Dkt. #15, at 11]. But speculation is not evidence, *Schaaf v. Astrue*, 602 F.3d 869, 876 (7th Cir. 2010); *See also Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."); *Roger Whitmore's Auto. Servs., Inc. v. Lake Cty.*, 424 F.3d 659, 669 (7th Cir. 2005) (to defeat summary judgment, plaintiff must present something beyond "bare speculation or a scintilla of evidence"), let alone "substantial evidence."

And, as this is arguably a close case, the "substantial evidence" standard is important. Substantial evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *see also Addis v. Dep't of Lab.*, 575 F.3d 688, 690 (7th Cir. 2009); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.2007). Substantial evidence has also been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). And, as already noted, "substantial evidence" is a term of art in administrative law, and that "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" in Social Security appeals. *Biestek*, – U.S. at –, 139 S.

Ct. at 1148.

The record shows that plaintiff had a couple of months each year where he was in recovery and likely unable to work – October/November 2016, April/May 2017, January/February 2018, March/April/May 2019, January/February 2020 – but for the rest of the time exam results, in the main, were normal, including gait. Through it all, the only issue plaintiff had was with his left foot. Sedentary work is performed mostly while sitting. Plaintiff's own treating physician thought he could perform full-time, sedentary work. The ALJ's RFC finding accommodated plaintiff further by limiting his standing or walking to no more than one hour and sitting for seven hours per workday and requiring the use of a handheld assistive device during the one hour of standing or walking.

Of course, the ALJ had to build a "logical bridge" from the record to her conclusion, but that does not require a thesis, just a minimal articulation of the ALJ's rationale. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.2008); *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). In this case, it has to be said the ALJ did a fairly thorough job. After a lengthy recital of the evidence, she provided an overview of her impressions:

> Overall, the record shows that the claimant's physical impairments did not result in the degree of functional limitation alleged by the claimant. The claimant clearly had pain in his left foot, imaging that showed initial surgery was not successful leading to more surgery, and some problems with ambulating at various times including needing to use a scooter, walking boot, and crutches. However, his uses of assistive devices generally occurred shortly after his surgeries. Subsequently, there are many appointments where there was no mention of the claimant using any assistive device, having a normal gait (8F/123, 93, 89, 33, 15), not using a cane (8F/93), being able to "walk for longer distances" (8F/108), walking in a "regular" shoe (8F/11, 18, 127) and walking "normally" (8F/5). Further, as explained below, the claimant also had many appointments where he reported having controlled pain, had providers not the claimant was doing well, and had treatment notes without any mention of the

claimant using any assistive device. Although he sometimes had tenderness, there were several exams with the claimant having no acute distress, no swelling, full strength, intact sensation, and a full range of motion. Recent imaging also revealed good alignment and did not note any new significant deficits. Further, he often reported his pain was controlled/manageable/improved with medication. Providers noted he was doing well post-operatively.

(R. 28). Perhaps that is not an unassailable distillation of the medical evidence, but it doesn't have to be. "Summaries of medical evidence, while definitionally 'partial and selective,' are appropriate." *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022); *Gedatus v. Saul,* 994 F.3d 893, 901 (7th Cir. 2021). Plaintiff would clearly weigh the evidence differently, but the court is not allowed to join the plaintiff in doing so. *Reynolds v. Kijakazi*, 25 F.4th 470, 474 (7th Cir. 2022); *Prill v. Kijakazi*, 23 F.4th 738, 746 (7th Cir. 2022).

From her summary, the ALJ then explained why she thought plaintiff could do sedentary work:

> Regardless, the claimant has been limited to sedentary work with no more than occasionally using the left foot for foot controls; no more than occasionally pushing/pulling with the left lower extremity; no more than occasionally climbing ramps or stairs but never climbing ladders, ropes, or scaffolds; no more than occasionally kneeling, crouching, crawling, or balancing; avoiding exposure to extreme heat or cold; avoiding dangerous machinery and unprotected heights; no more than occasionally operating a commercial motor vehicle; standing or walking no more than one hour and sitting for seven hours per workday; and using a handheld assistive device during the one hour of standing or walking. These limitations accommodate the claimant's physical impairments, including all the exertional and postural and left lower extremity limitations to accommodate his pain and difficulty using the left leg, the standing/walking limitation to accommodate his reported pain while doing those activities, the temperature limitations to accommodate any reported increase in pain in his left foot, and the need for a handheld device to accommodate his report of needing one despite (as explained above) the many appointments where he was not using one and having physical exams with a normal gait. However, the record does not support further limitations.

(R. 28). Is the explanation perfect? Perhaps not but, again, it doesn't have to be. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1998). Indeed, perfection is nowhere demanded in any sphere of human

endeavor, *Wilcox v. Commissioner of Social Security*, 2018 WL 4090328 at *4 (W.D.N.Y. 2018); nor is it attainable. *Old Colony Bond Holders v. New York*, *N.A. & H.R. Co.*, 161 F.2d 413, 448 (2nd Cir. 1947). The ALJ properly listed plaintiff's limitations in the work environment, and supported her reasoning with objective evidence from the record. *Grotts*, 27 F.4th at 1280. A person with a bad foot and pain from that foot would seem to be able to do a job where they were seated nearly the entire day.

For the plaintiff, there seem to be two problems with the ALJ's conclusion that he can do sedentary work: his cane and his pain. First, the cane. The plaintiff submits that if, as the ALJ found, he needed a cane to stand or walk for even an hour a day, he would have to use his free hand to hold on to things for balance and would be unable to work. [Dkt. #15, at 6, 7, 10-11]. But that's not part of the RFC, which as already noted, is properly supported by "substantial evidence." Based on that RFC, the vocational expert testified that in sedentary jobs – including the examples she identified – using a hand-held assistive device to walk "would have no impact . . . ." (R. 63-64). *Cf. Martinez v. Astrue*, 316 F. App'x 819, 825 (10th Cir. 2009)("While we do not doubt that a claimant limited to walking with a cane might not be able to perform some sedentary jobs for the reasons [plaintiff] has indicated, she has advanced no argument that any of the three sedentary jobs the VE identified . . . are so affected.").

There isn't any medical evidence to support plaintiff's claim about needing not only a cane, but also a free hand to steady himself when standing or walking. Plaintiff's own treating physician indicated there was no medical need for a cane; plaintiff used one by choice. (R. 562). And certainly, the record has entry after entry indicating that plaintiff had no issues with his gait, as the ALJ pointed out. (R. 28, 29). All there is are plaintiff's allegations and that's not enough. SSR

16-3P, 2017 WL 5180304, at *2. If it were otherwise, every plaintiff in every Social Security case would prevail. It is the plaintiff's burden to prove she is disabled by providing medical evidence beyond her claims. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) ("But subjective complaints are the opposite of objective medical evidence . . . ."); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)("The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, ....."); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."); 20 C.F.R. § 404.1512(c)("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). Moreover, plaintiff didn't testify that he had to hang onto furniture and things like that for balance. (R. 45). He even said he could walk to the end of his block and back. (R. 45). There's no furniture on the sidewalk. So, even using a cane for balance, he is left with a free hand.

Plaintiff's other contention is that his pain is of a level that he would be unable to work. As is often the case in these proceedings, the question is not whether a plaintiff feels pain, but how much. No one in this case – including the ALJ – is saying that plaintiff doesn't experience pain in his foot. The question is whether he can perform a job where he sits nearly all day despite that pain. Being unable to work without pain does not entitle someone to disability benefits. *See, e.g., Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010)(affirming ALJ's decision noting that "[d]isability requires more than mere inability to work without pain."); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989)("Even if [plaintiff] did experience some discomfort, this alone does not establish disability."); *Brown v. Bowen*, 801 F.2d 361, 362 (10th Cir.1986) ("disability requires more than

mere inability to work without pain"). People working without pain or discomfort, especially after age 40 or 50, are few and far between. If pain while working was all it took to qualify for disability benefits, "eligibility for disability benefits would take on new meaning." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2nd Cir. 1983). The numbers of people who work full-time with pain are legion.

The ALJ didn't believe *the extent* of plaintiff's allegations regarding his pain, and she gave good reasons for not doing so. The ALJ looked at the medical record, noting that there were many instances where there was no mention of the claimant using any assistive device, having a normal gait, not using a cane, being able to "walk for longer distances", walking in a "regular" shoe, or walking "normally." (R. 28). The ALJ also noted that the plaintiff often reported having controlled pain, or where doctors noted he was doing well, or exams where doctors noted no acute distress, no swelling, full strength, intact sensation, and a full range of motion. The ALJ also noted that plaintiff was not compliant with medical advice. (R. 28). The ALJ adequately explained her reasoning for rejecting the full extent of plaintiff's claims regarding his pain. *See, e.g., Kaplarevic v. Saul*, 3 F.4th 940, 943 (7th Cir. 2021)(". . . the record before the ALJ showed that [plaintiff] did not comply with prescribed therapy, [and] that his pain complaints were not consistent with objective medical findings, . . . ."); *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020)(ALJ properly relied on objective medical evidence to discount complaints of debilitating pain); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010)("discrepancies between the objective evidence and self-reports may suggest symptom exaggeration"); *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005).

## B.

Plaintiff's other major issue with the ALJ's decision is her treatment of his mental impairments: she found them non-severe and only mildly limiting at worst – not significant enough

to result in additional limitations on plaintiff's ability to work. The plaintiff thinks the ALJ was wrong about his mental impairments being non-severe and that, even if they were non-severe, the ALJ should have found that they caused some limitation when considering them in combination with his foot.

While there is medical evidence to support plaintiff's foot impairment and to suggest he suffers pain to some extent, there is little or no medical evidence to support any limitations resulting from any mental impairment. In arguing that the ALJ relied entirely on a few daily activities to find plaintiff had no severe mental impairments [Dkt. #15, at 11-13], the plaintiff has chosen to ignore the ALJ's repeated references to the medical record to support her finding:

> During a psychological consultative exam, the claimant reported liking to play chess and having no history of impulsive or inappropriate spending, gambling, substance abuse or other issues that might contraindicate managing his own funds (3F). During a mental status exam, he had no deficits with orientation, fund of knowledge, capacity for abstraction, capacity for classification and categorization, and judgment. The examiner believed the claimant could manage his funds. During medical appointments, the claimant was oriented (1F/2; 8F/124; 1F/38, 63, 90; 6F/15; 5F/19; 5F/10; 8F/161), had normal thought process (5F/19), had normal recent and remote memory (8F/124; 5F/10; 8F/161), and had normal insight and judgment (8F/124; 6F/15; 5F/10; 8F/161).
>
>            \*      \*      \*
>
> The next functional area is interacting with others. In this area, the claimant has no limitation. During a psychological consultative exam, the claimant reported living with his father and brother (3F). During a mental status exam, he had no deficits with cooperation including being calm, affect, answering questions, and speech. During medical appointments, the claimant had a normal affect (1F/2; 8F/124; 1F/38, 63, 90; 6F/15; 5F/19; 5F/10; 8F/161), and had normal speech (5F/19; 8F/95). The record does not contain any instances of the claimant failing to understand provider questions and remember the claimant's own medical history during appointments.
>
>            \*      \*      \*
>
> The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. During a psychological consultative exam, the claimant reported liking to play chess; and reported having no history of impulsive or inappropriate spending, gambling, substance abuse or other issues that might contraindicate managing his own funds (3F). During a mental status exam, he had no deficits with orientation, concentration, and attention. The examiner believed the

24

claimant could manage his funds. During medical appointments, the claimant denied having confusion problems (5F/17), had normal thought process (5F/19), and was oriented (1F/2; 8F/124; 1F/38, 63, 90; 6F/15; 5F/19; 5F/10; 8F/161). The record does not contain any instances of the claimant having difficulty concentrating, answering questions, or complying with requests including exams and testing during appointments.

*        *        *

The fourth functional area is adapting or managing oneself. . . . During a mental status exam, he had no deficits with grooming, attire, affect, capacity for abstraction, capacity for classification and categorization, and judgment. He had no issues with unusual content or preoccupations, hallucinations or delusions, or any history of suicidal or homicidal ideation or attempts. The examiner believed the claimant could manage his funds. During medical appointments, the claimant had no suicidal or homicidal thoughts (8F/102, 105, 170), had a normal mood and affect (1F/2; 8F/124; 1F/38, 63, 90; 6F/15; 5F/19; 5F/10; 8F/161), and exams with no psychiatric deficits (1F/2; 8F/124; 1F/38; 1F/63, 90; 6F/15; 5F/19, 10; 8F/161).

(R. 20-21). The ALJ provided a fairly good description of the medical evidence – or lack thereof – as it related to any mental impairments plaintiff might have. There simply isn't much – let alone sufficient – evidence to support any limitations.

The plaintiff has simply ignored the portions of the record the ALJ pointed to. While mental status exams may have been brief, they are all the evidence plaintiff provided, and it's worth taking a brief look at them to get their gist:

October 4, 2016: appropriate mood and affect (R. 310)

April 18, 2017: appropriate mood and affect (R. 355)

November 1, 2017: no panic attacks, no trouble with mood (R. 740)

September 29, 2017: anxiety controlled, no depression (R. 747)

June 30, 2017: anxiety controlled, no depression (R. 749-50)

March 1, 2017: reported nervousness and restlessness, but denied depressed mood; intact recent and remote memory, intact judgment and insight, normal mood and affect (R. 768-69)

January 8, 2021: stable mood and anxiety; intact recent and remote memory,

25

judgement and insight, normal mood and affect (R. 806-07)

March 9, 2020: mood, memory, affect, and judgment normal (R. 611).

April 3, 2020: mood and affect normal, speech normal, thought process normal for age (R. 582)

June 30, 2020: mood, memory, affect, and judgment normal (R. 573)

The gist is: normal, normal, normal, normal, normal. Again, the plaintiff simply brushes aside all these examination notes. Interestingly, in his brief, the plaintiff reminds us that "the ALJ may not 'cherry pick' pieces of evidence that support a conclusion of no disability, while ignoring related evidence that undermines his conclusion." [Dkt. #15, at 7-8 (citing *Scrogham v. Colvin*, 765 F.3d 685 (7th Cir. 2014)]. But neither can a plaintiff. It is a rule the plaintiff might well apply to his own contentions – and one that cannot be ignored.

The plaintiff does discuss his consultative exam in January 2020, but it's difficult, if not impossible, to see how plaintiff arrives at his interpretation of that report. The consultative psychologist's findings were essentially the same as the foregoing mental status exams by plaintiff's own doctors. Affect was grossly appropriate, and speech was logical. (R. 558). Concentration and attention were normal. (R. 559). Capacity for abstraction was reasonably well-developed. Capacity for classification and organization was adequate. (R. 559). The plaintiff curiously characterizes these findings as "psychologically based deficits." [Dkt. #15, at 13]. It is anything but apparent – or logical – how the plaintiff gets to "deficits" from: "appropriate," "logical," "normal," "well developed," and "adequate." To get from the evidence to where the plaintiff wants the court to go, plaintiff needed to supply something along the lines of the Mackinac Bridge.

Plaintiff is correct that an ALJ has to consider the combined effects of severe *and* non-severe impairments. *See, e.g., Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). But where the medical

26

evidence regarding a non-severe impairment says "normal", "normal", "normal", over and over, where is the ALJ supposed to come up with a limitation on the capacity for work? The plaintiff doesn't offer any answer other than his own allegations. [Dkt. #15, at 13-14]. Again, that's not sufficient. And it cannot be too often repeated that merely "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). *Accord Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 473 (7th Cir. 2018); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 770 (7th Cir. 2020)("Notably absent from these allegations, however, is any proposed proof that state actors, not municipal actors, were engaged in this *de facto* discrimination."); *Donald J. Trump for President, Inc. v. Secy of Pennsylvania*, 830 F. Appx 377, 381 (3d Cir. 2020)("But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here."). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, _U.S._, 138 S.Ct. 767, 779 (2018); *Bowers v. Dart*, 1 F.4th 513, 520 (7th Cir. 2021)("With all of this evidence in mind, we share the district court's conclusion that a rational juror could doubt that Bowers was telling the truth by insisting he could not walk."). "Talk is cheap," *Planned Parenthood of Indiana and Kentucky v. Box*, 949 F.3d 997, 998 (7th Cir. 2019). A plaintiff has to come forward with medical evidence to show his impairments prevent him from working. If the plaintiff thinks he has limitations that are supported by the examination findings, he must explain how. *Gedatus*, 994 F.3d at 905 (plaintiff "has not pointed to any medical opinion or evidence to show [his impairments] . . . caused any specific limitations."); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)("It is unclear what kinds of work restrictions might address [plaintiff's] limitations in concentration, persistence, or pace because he hypothesizes none.").

It cannot be too often repeated that it is up to the plaintiff to come forward with *medical* evidence to support the existence of limitations due to mental impairment. *See Schaaf*, 602 F.3d at 875; *Eichstadt*, 534 F.3d at 668; *Scheck*, 357 F.3d at 702; *see also Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019)(ALJ properly disregarded mental impairment limitations based on subjective complaints). Examination notes that mention only normal findings cannot get that job done.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #18] is granted and the ALJ's decision is affirmed.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/21/22

28